UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: ) | |
| ) | |
|     JIN H. KIM ) | Case No. 05-13683-SSM |
|     YEON M. KIM ) | Chapter 7 |
| ) | |
|                Debtors ) | |
| ) | |
| BUTLER CAPITAL CORP. ) | |
| ) | |
|                Plaintiff ) | |
| ) | |
| vs. ) | Adversary Proceeding No. 05-1575 |
| ) | |
| JIN H. KIM, *et al.* ) | |
| ) | |
|                Defendants ) | |

**MEMORANDUM OPINION**

This is an action to determine the dischargeability of a $248,909 confessed judgment obtained by Butler Capital Corporation against Jin H. Kim and Yeon M. Kim arising from a $160,000 loan made to acquire a pizza delivery and carry-out business.  Trial was held without a jury on September 7, 2006.  At the conclusion of the plaintiff's evidence, the court granted Yeon M. Kim's motion for judgment on partial findings and dismissed the complaint as to her.  At the conclusion of the trial, the court took the remaining issues under advisement.  For the reasons stated, the court determines that Jin H. Kim's liability is excluded from discharge based on a false representation that he was putting $65,000 of his own cash into the purchase of the business, when in fact there was a secret agreement with the seller to take back a $100,000 promissory note instead.  This opinion constitutes the

1

court's findings of fact and conclusions of law under Rule 52(a), Federal Rules of Civil Procedure and Rule 7052, Federal Rules of Bankruptcy Procedure.

Background and Findings of Fact

Jin H. Kim and Yeon M. Kim ("the debtors") are husband and wife. They filed a joint voluntary petition in this court on September 20, 2005, for relief under chapter 7 of the Bankruptcy Code and received a discharge of their dischargeable debts on January 6, 2006.

Prior to the filing of the bankruptcy petition, a confessed judgment had been entered against the debtors in the Circuit Court for the City of Alexandria, Virginia, in favor of Butler Capital Corporation in the principal amount of $198,953.83.[1] The judgment was based on the debtors' personal guarantee of a defaulted $160,000 loan made by Butler to a corporation named Mania, Inc. The loan was made to enable Mr. Kim to acquire 100 percent of the stock of the corporation—which operated a pizza business in Fairfax, Virginia, under the name of Mr. Pepperoni Pizza—from the existing owner, Adnan Aguilar.

Mr. Kim had originally approached Mr. Aguilar about purchasing a different Mr. Pepperoni Pizza location from him in Arlington, Virginia, but the landlord would not agree to an assignment of the lease. Mr. Aguilar then agreed to sell him the Fairfax location, which he represented grossed approximately $10,000 per week. Mr. Kim and Mr. Aguilar

---

[1] The note required 72 payments of $3,385.00 per month, for a total of $243,720, which was the face amount of the note. The note did not carry a stated rate of interest, but the required payments equate to an annual percentage rate of approximately 15%. In obtaining the confessed judgment, Butler discounted the payments not yet due to present value using a 5% discount rate. With costs and 25% attorney's fees added, the total judgment came to $248,909.83.

2

then signed a stock purchase agreement, prepared by Mr. Kim's attorney, under which Mr. Kim would purchase all of the stock in Mania for $280,000.

Mr. Kim was referred by his employer (who operated a mortgage company) to Peter Jin, a business loan broker.  Mr. Jin in turn approached Won Chu, the "Asian market" business development manager of Butler Capital Corporation, about making a loan for the purchase.  Based on his experience and the reported weekly gross sales, Mr. Chu determined that the sales price was too high and advised Mr. Kim that Butler would not consider making a loan unless the price was reduced to $220,000.  Mr. Kim and Mr. Aguilar signed an addendum reducing the price to $220,000, of which 30% was to be supplied by Mr. Kim and 70% was to be obtained as a loan from Butler.

Mr. Jin obtained information and documents from Mr. Kim in support of a loan application and supplied them to Mr. Chu.  The documents included four months of bank statements, two years of income tax returns, and a resume of Mr. Kim's prior business experience.  The tax returns showed adjusted gross income for Mr. and Mrs. Kim of $25,011 in 2002 and $22,553 in 2003.  The bank statements showed average daily balances ranging from $1,577 to $4,160.   Mr. Jin also orally obtained information from Mr. Kim that he used to complete a personal financial statement—which was submitted to Mr. Chu as part of the application—but did not have Mr. Kim sign it.  The unsigned financial statement reported Mr. Kim as having total assets of $295,000, including $60,000 on deposit at Bank of America and $25,000 "cash on hand."

The loan application was considered by Butler's loan committee, which approved a loan of $160,000 to be secured by the stock in the business, the business assets, a collateral

assignment of the lease for the store, and an indemnity deed of trust against a parcel of real estate in Poolesville, Maryland, owned by Shin Yun, a friend of Mr. Kim. Robert Pollack, senior vice president and general counsel for Butler, was one of the members of the loan committee. He testified that Butler typically would not make a business acquisition loan where 100% of the purchase price was being borrowed because Butler believed it was important for the new owner have funds at risk. He further testified that an important factor in approving the loan was the loan-to-value ratio of less than 70%.

Settlement of the loan and the sales contract occurred separately, but on the same day, January 20, 2005. The loan settlement took place at Mr. Jin's office. Mr. Kim had been told that he would have to provide evidence of the cash he was putting into the acquisition of the business. He provided Mr. Jin with photocopies of two cashier's checks drawn on Provident Bank payable to Mr. Aguilar, one in the amount of $20,000, and the other in the amount of $45,000. The checks, as it turns out, had been purchased by Mr. Yun, and were returned to him after the photocopies were made.[2] Mr. Aguilar agreed, in lieu of receiving the $65,000 at settlement, to take back a promissory note for $100,000, which would include a $40,000 loan to Mr. Kim for operation of the business.[3] The sale closing

---

[2] To say that the testimony concerning the checks was sketchy and confusing would be an understatement. It would appear, however, that Mr. Yun sold or refinanced a house and used the proceeds to purchase the first of the two checks. After it was photocopied and returned to him, Mr. Yun returned it to the bank and purchased the second check. Thus, it appears there was never more than $45,000. Although the record is not sufficiently developed for the court to make a specific finding on the point, it would further appear that the $45,000 came from a refinance (approximately three weeks prior to the settlement) of the same parcel that was being offered as additional collateral for the Butler loan.

[3] The $5,000 discrepancy between the amount of the note and the sum of the two figures
(continued...)

took place at the office of attorney Steve Y. Yun (no relationship, apparently, to Shin Yun). The attorney prepared a settlement statement, which both Mr. Kim and Mr. Aguilar signed, showing a $65,000 deposit from Mr. Kim. That sum, however, was not deposited with the settlement attorney, who simply accepted Mr. Aguilar's assurance that he had received the money. The settlement statement was provided to Butler, which reviewed it before funding the loan on January 27, 2005, by wire transferring $160,000 to the attorney's office. Following the settlement, another attorney, Michael Kim (who was representing Mr. Aguilar in the transaction) prepared the $100,000 note, which carried an interest rate of 8.5% and was repayable in equal monthly installments over a period of 60 months. The $40,000 that Mr. Aguilar loaned to Mr. Kim came from the proceeds of Butler's loan and was paid by the settlement agent to an intermediary (a friend of Mr. Kim) in whose favor Mr. Aguilar had executed an assignment in that amount.

The business, unfortunately, did not generate the expected revenues,[4] and Mr. Kim used the money loaned by Mr. Aguilar to make the monthly payments to Butler. By May 2005 the loan was in default. Six thousand dollars was realized by Butler from sale of the restaurant equipment. An additional $25,000 was received from the sale of the house that Mr. Yun put up as collateral.[5] The confessed judgment against Mr. and Mrs. Kim on their

---

[3](...continued)
(the $65,000 cash and the $40,000 loan) which it represents is unexplained by the testimony.

[4] The records provided to Butler (and presumably Mr. Kim) reflected gross receipts for the business of $289,169 for 2003 and $389,795 for 2004. Mr. Kim testified that after he took over the business, the revenues never reached $5,000 a week, and that his attempts to get Mr. Aguilar to repurchase the business were unsuccessful.

[5] Because, unbeknown to Butler, Mr. Yun had refinanced the property approximately three
(continued...)

guarantees was entered on August 30, 2005, and the chapter 7 case was filed three weeks later.

## Conclusions of Law and Discussion

### I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. An action to determine the dischargeability of a debt is a core proceeding in which a final judgment or order may be entered by a bankruptcy judge. 28 U.S.C. § 157(b)(2)(I). Venue is proper in this district under 28 U.S.C. § 1409(a). The defendants have been properly served and have appeared generally.

### II.

A chapter 7 discharge does not discharge a debtor from certain specified categories of debt, including debts

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive.

---

[5](...continued)
weeks before the indemnity deed of trust was recorded, the equity in the property was less than half of what Butler had been led to believe.

§ 523(a)(2), Bankruptcy Code.  It is important to note that different standards apply depending on whether the false statement is one "respecting the debtor's ... financial condition."  If it is, the statement must be in writing and the creditor must have "reasonably" relied on it.  § 523(a)(2)(B), Bankruptcy Code.  Other types of misrepresentations need not be in writing and the creditor's reliance need only be "justifiable," which is a lesser standard than "reasonable."  § 523(a)(2)(A), Bankruptcy Code; *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).  To show actual fraud under § 523(a)(2)(A), the creditor must prove the following elements:  "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 134 (4th Cir. 1999).  The burden of proof is on the plaintiff, and the standard of proof is preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

### III.

At the conclusion of the plaintiff's evidence, the court dismissed the dischargeability claim against Mrs. Kim because there was no evidence that she had made any actionable misrepresentations.[6]  A separate order has already been entered reflecting that ruling.

### A.

The situation with respect to Mr. Kim is very different.  There is no question that the settlement statement signed by Mr. Kim, together with the photocopies of the two (by then

---

[6] A full statement of the court's reasons for dismissing the complaint as to Mrs. Kim was set forth orally on the record.

nonexistent) cashier's checks, constitutes a representation that Butler's loan was the only loan in the transaction and that Mr. Kim was investing $65,000 of cash into the business. There is also no question that the representation was false when it was made.[7] Although the testimony of Mr. Kim was difficult to follow and somewhat contradictory at points, it seems clear that he and Mr. Aguilar had decided prior to the settlement that Mr. Aguilar would take back a note in lieu of the cash called for by the stock purchase agreement. It also seems clear from the evidence that a conscious effort was made to keep the truth from Butler. The note was not prepared by, or disclosed to, the settlement attorney. Additionally, the $40,000 loan to Mr. Kim from the sales proceeds was not made directly, but through an intermediary. Finally, there is more than sufficient evidence to show both that Butler relied on the representation that the debtor would be putting cash into the transaction and that its reliance was reasonable. The testimony of Butler's general counsel established that Butler would generally not make a business acquisition loan for 100% of the purchase price and generally did not allow secondary financing, based on its belief that a purchaser who had actual cash at risk would be more likely to work hard at making a go of the business and would be less likely to walk away if problems arose.

Based on the testimony, the court finds that the representation that Mr. Kim was putting $65,000 of his own cash into the business was a material inducement for Butler to make the loan. Although it could be argued that the debtor's tax returns and bank statements submitted in

---

[7] In this respect, the settlement statement differs from the amended stock purchase agreement submitted to Butler in support of the loan application. Although the agreement is signed by Mr. Kim and represents that 30% of the $220,000 purchase "shall be due from the purchaser," with the remaining 70% to come from a loan by Butler Capital, there is no evidence that any side agreement existed at that time for Mr. Aguilar either to take back a note or to loan Mr. Kim part of the sales proceeds. It appears, rather, that the side agreement was reached sometime in the period immediately leading up to the settlement.

support of the loan application did not reflect an income level or bank account activity that would have been consistent with an ability to put up $65,000 in cash, Butler's witnesses testified that finances within the Korean community were often difficult to verify, since many members of the community did not have traditional banking relationships. That deficiency would reasonably have been resolved by direct evidence that Mr. Kim actually had $65,000. He furnished that evidence by providing copies of two cashier's checks totaling $65,000 payable to Mr. Aquilar. Although in hindsight Butler should have insisted on seeing the originals, it was not necessarily unreasonable to rely on the copies, particularly as the settlement statement corroborated Mr. Aguilar's receipt of the $65,000 "deposit." Finally, there is no question that Butler has been harmed. The Butler loan went into default as soon as the debtor went through the $40,000 borrowed from Mr. Aguilar, with the debtor walking away from the business when it did not generate the revenues he had expected.

B.

Moreover, even apart from any misrepresentations as to the *source* of the $65,000, there was a misrepresentation concerning the intended use of the funds loaned by Butler. The purpose of that loan was to acquire the business. Put another way, Butler was not making an operating loan. And yet, that is precisely what happened. Forty thousand dollars of Butler's money was loaned back under the table to enable Mr. Kim to pay the operating expenses of the business, including, as it turned out, the payments on Butler's own loan. A misrepresentation as to the purpose to which a loan is to be put may be sufficient to bar discharge of the obligation. *See Writer v. Mistry (In re Mistry)*, 77 B.R. 507, 511 (Bankr. E.D. Pa. 1987) (finding that debtor's representation that loaned funds would be put in a bank

9

account, when debtor intended instead to invest them in volatile commodities market, was a false representation); *Allegheny Co. U.S. Gov't Employees F.C.U. v. Wimbish (In re Wimbish)*, 95 B.R. 379 (Bankr. W.D. Pa. 1989) (holding that debtor's representation that loan proceeds would be used for home improvements when debtor intended to use them to cure mortgage arrearage was a false representation).  Because a representation as to the intended use of the loan proceeds is not a representation concerning financial condition, it need not be in writing, and the creditor's reliance need only be justifiable. *See Barron v. Messenger (In re Messenger)*, No. 94-12217, A.P. No. 95-1031, 9-10 (Bankr. E.D. Va., December 5, 1995)*,* http://www.vaeb.uscourts.gov/opinions/ssm/messnger.pdf.  The standard of "justifiable" reliance requires more than simply actual reliance, but does not require that the reliance be objectively reasonable. *Field*, 516 U.S. at 77, 116 S. Ct. at 447.  A creditor may be justified in relying on a debtor's representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id*. at 70, 116 S. Ct. at 444 (internal quotation marks omitted).  At the same time, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id*. at 71, 116 S. Ct. at 444 (internal quotation marks omitted).

      Here, Butler only disbursed the loan after receiving a settlement statement—which not only was prepared by an attorney and signed by Mr. Aquilar and Mr. Kim, but was also consistent with the amended stock purchase agreement—showing that the loan proceeds were being used to purchase the business, not to provide operating capital.  Given these

circumstances, the court has little difficulty in finding that Butler's reliance on Mr. Kim's representation as to the intended use of the loan proceeds was justifiable.

C.

For the foregoing reasons, the court determines that Mr. Kim's liability to Butler is non-dischargeable under § 523(a)(2).  A separate judgment will be entered to that effect.[8]

Date: _____          _____
                                       Stephen S. Mitchell
Alexandria, Virginia                   United States Bankruptcy Judge


Copies to:

Julian Karpoff, Esquire
Karpoff & Title
P.O. Box 990
Arlington, VA  22216
Counsel for the plaintiff

David E. Jones, Esquire
11211 Waples Mill Road, Suite 210
Fairfax, VA  22030
Counsel for the defendants

---

[8] Since a money judgment has already been entered, this court's judgment will be limited to a determination of nondischargeabilty.  *See Heckert v. Dotson (In re Heckert)*, 272 F.3d 253 (4th Cir. 2001) (holding that bankruptcy court did not have jurisdiction to enter money judgment in connection with determination of dischargeability where claim had already been reduced to judgment in state court).